IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| **Blue Compass RV, LLC** § <br> **f/k/a RV Retailer, LLC** § <br> § <br> **Plaintiff** § <br> § <br> v § <br> § <br> **Twin City Fire Insurance Company** § <br> § <br> **Defendant** § | Cause No.: _____ |

**PLAINTIFF'S ORIGINAL COMPLAINT**

Plaintiff Blue Compass RV, LLC f/k/a RV Retailer, LL C ("Blue Compass") files this Original Complaint against Defendant Twin City Fire Insurance Company and would show:

**PARTIES, JURISDICTION, AND VENUE**

1. Blue Compass is a limited liability company organized under the laws of the State of Delaware. Its members are citizens of Texas, Pennsylvania, Maryland, Florida, Arizona, and Washington, D.C. As a limited liability company, Blue Compass is a citizen of every state where one of its members is a citizen. *Harvey v. Grey Wolf Drilling Co.*, 542 F.3d 1077, 1080 (5th Cir. 2008).

2. Twin City is a foreign stockholder insurance company licensed to conduct business in Texas. On information and belief, Blue Compass alleges that Twin City is organized under the laws of the State of Indiana and has its principal place of business in Connecticut. Therefore, Twin City is a citizen of Indiana and Connecticut. *See* 28 U.S.C. § 1332(c)(1). Twin City may be served with process by serving its designated agent for service of process, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201-3136.

3. The amount in controversy exceeds $75,000 because Blue Compass seeks recovery for its nearly $3,000,000 loss as a result of its employee's theft plus attorneys' fees, prompt pay interest under the Texas Insurance Code, and treble damages under the Texas Insurance Code. *See Ramirez v. Allstate Vehicle & Prop. Cas. Ins. Co.*, 490 F. Supp. 3d 1092, 1113 (S.D. Tex. 2020) ("[W]hen ascertaining the amount in controversy under an insurance policy, the amount may include the policy limits, potential attorneys' fees, penalties, statutory damages, and punitive damages, but not interest or costs.").

4. This Court has personal jurisdiction over Twin City because Twin City has purposefully availed itself of the privilege of conducting activities in the state of Texas, and this suit arises out of and relates to those activities. *See Ford Motor Co. v. Montana Eighth Judicial District Court*, 592 U.S. 351, 359 (2021). Specifically, Twin City issued an insurance policy to Blue Compass in Texas, communicated with Blue Compass in Texas, and ultimately issued its denial letter to Blue Compass in Texas. As a result, Twin City had fair warning that it would be subject to the jurisdiction of this Court. *Id*. at 360.

5. Venue is proper in this Court because a substantial part of the events or omissions giving rise to this case occurred in the territorial jurisdiction of this Court. *See* 28 U.S.C. § 1391(b)(2). Specifically, Twin City issued its denial letter—the action constituting the breach of contract—to Blue Compass's corporate offices in Richardson, Collin County, Texas.

## BACKGROUND

**I.     Blue Compass's Business**

6. Blue Compass is a national RV retailer who, through its subsidiaries, has inventory at more than 100 locations across the United States.

7. In addition to selling and servicing RVs through its dealership network, Blue Compass also sells extended warranties, wheel and tire coverage, interior and exterior damage

protection, and GAP insurance. These are known in the industry as Finance and Insurance products ("F&I Products").

8. Blue Compass purchases the F&I Products from an F&I vendor and then sells them to its retail customers through its dealership network.

9. Laura Rogers was a Specialty Insurance Administrator for Blue Compass who had knowledge of the market for F&I Products. Blue Compass relied on Rogers for assistance in securing deals for F&I Products with its vendors based on her considerable experience in the industry.

10. Although Rogers was not the ultimate decision-maker with respect to which F&I vendors Blue Compass contracted with, her experience with this market and role directly working with the vendors meant that she played a significant role in Blue Compass's decision, both in terms of which F&I vendors to contract with and the prices Blue Compass agreed to pay for the F&I Products.

11. In particular, with Rogers's assistance, Blue Compass contracted with EcoPro Products ("EcoPro") (later acquired by American Guardian Warranty Services ("AGWS")) for its EcoPro environmental protection product and Nation Motor Club, LLC d/b/a Nation Safe Drivers ("NSD") for wheel and tire coverage and GAP insurance.

**II.   Laura Rogers's scheme to steal from Blue Compass**

12. Unbeknownst to Blue Compass, Rogers negotiated a price that built in a "commission" to herself of $10 for each wheel and tire warranty and $15 for each GAP warranty. She negotiated with the vendors to funnel Blue Compass's money to Aviance Holdings, LLC as a kickback for convincing Blue Compass to contract with that vendor. Rogers is the sole member of Aviance.

13. Blue Compass's employee handbook required Rogers to disclose any conflicts of interest between her and any supplier, distributor, or contractor. Rogers never disclosed this conflict of interest to anyone at Blue Compass.

14. In total, Rogers successfully stole at least $2,477,339 from Blue Compass in the form of kickbacks from the F&I vendors under this scheme. During the same period where she was inflating Blue Compass's costs for F&I Products in order to funnel the difference back to herself, Rogers received $498,996 in salary from Blue Compass.

15. Notably, when Blue Compass attempted to renegotiate EcoPro's prices in 2022, EcoPro told Blue Compass that it could not lower the prices because of certain "fixed costs." As Blue Compass later learned, those "fixed costs" included Rogers's kickbacks.

16. In August 2022, Blue Compass entered into a comprehensive agreement with AGWS for the purchase of certain F&I Products (wheel and tire coverage and GAP insurance) to begin in January 2023, and to continue the EcoPro F&I product with AGWS (through its recently acquired EcoPro division). As a result, it terminated its relationship with NSD effective January 1, 2023.

17. In February 2023, after Blue Compass terminated its relationship with NSD, it received an email from NSD's agent, Matthew Galletta, which exposed Rogers's scheme. In the email, Galletta explained that, but for Rogers's demands that she be "compensated" for steering Blue Compass to his business, the money paid to Aviance would have either gone back to owners of Blue Compass or reduced its costs for the F&I Products.

> Jon
>
> I wanted to inform you that for the last 5 years, Laura Rogers has been getting paid $10 on every tire and wheel warranty, and $15 on every gap warranty sold since Don Strollo owned RV One. This came about when Laura was working for Don, and contacted my agency to pitch tire and wheel and gap products for RV One group. She made it clear that to get the business she needed to be compensated. When you began RVR LLC., she again approached my agency with the opportunity to pitch RVR LLC. in Ft. Lauderdale our tire and wheel, and gap products. In order to get that opportunity the SAME arrangement for payment was demanded by Laura. As of the end of 2022 she has been paid to her Aviance Holdings Inc. the approximate total of $750,000.00 that normally would have gone back to you the owners (Jon and Don) of both RVR LLC and RV One Inc. or would have reduced your costs for the products. She was paid $299,643.91 in just 2022 alone. All payments were made by my Axis Automotive Products Inc agency. I just wanted you to be aware of the arrangement.
>
> Matthew G.
> 610-248-1148

18.     Prior to February 2023, no one at Blue Compass was aware of Rogers's ongoing efforts to steal from Blue Compass—other than Rogers herself—including Blue Compass's CFO, Jennifer Robinson.

19.     Upon receiving Galleta's email, Blue Compass began an investigation in which it learned that Rogers had been stealing from Blue Compass since as early as December 2018.

20.     During the course of the investigation, Blue Compass learned that Rogers was taking steps to hide her theft from Blue Compass. One such way was by communicating with vendors through her Gmail account instead of her Blue Compass email address to negotiate her kickbacks. Additionally, even when she did use her Blue Compass email account, she made sure never to copy other Blue Compass employees on emails discussing her kickbacks.

21.     Another way Rogers hid her scheme was by altering documents provided to Blue Compass's accounting department. She would receive the monthly and quarterly statements from F&I vendors and redact them to hide her "commissions" before providing the statements to Blue Compass's accounting department. For example, on February 11, 2021, Rogers received an email from EcoPro setting forth the amounts owed as a result of the sale of F&I Products. The email stated that EcoPro owed Blue Compass $18,960 and *owed Aviance $28,440*. In the subsequent

draft email from Rogers's company email account, of course, all references to Aviance were deleted and only the payments owed to Blue Compass remained.

22. After Blue Compass terminated Rogers and alerted AGWS to Rogers's theft, Blue Compass and AGWS agreed that AGWS would begin sending the amounts that had previously gone to Rogers for the EcoPro product as a rebate to Blue Compass. The parties agreed to this structure as a way to avoid having to modify their already-existing contracts. The net effect of this was that Blue Compass paid less for EcoPro products while AGWS received the same amount for the product because AGWS was no longer paying a portion of Blue Compass's money to Rogers. In other words, for the sales after Rogers's scheme was discovered, Blue Compass was not deprived of money that would be used to pay Rogers's kickbacks. But Blue Compass continues to be deprived of the money stolen by Rogers before her scheme was discovered.

### III. The Twin City Policy

23. Twin City issued insurance Policy No. 46 KB 0492036-22 to Blue Compass. The Policy has effective dates of December 7, 2022 to December 7, 2023. The Policy included a Crime Coverage Part that became effective January 21, 2023.[1]

24. The Crime Coverage Part contained, among others, the following provisions:

a. **INSURING AGREEMENT 1. - EMPLOYEE THEFT**

The Insurer will pay for loss of or damage to **Money**, **Securities** and **Other Property** that results directly from **Theft** by an **Employee**, whether or not identifiable, while acting alone or in collusion with other persons.

b. **"Money"** means currency, **Virtual Currency**, coins and bank notes in current use and having a face value; and traveler's checks, register checks and money orders held for sale to the general public.

---

[1] A copy of the Crime Coverage Part is attached as Exhibit 1.

  c. **"Occurrence"** means: (1) as respects Insuring Agreement 1, all loss caused by, or involving, one or more Employees, whether the result of a single act or a series of acts; . . .

  d. **"Other Property"** means any tangible property other than **Money** or **Securities** that has intrinsic value but does not include any property excluded under this **Non-Liability Coverage Part**. **Other Property** does not include trade secrets, proprietary information, confidential information or any copyrights, patents, trademarks, proprietary manufacturing or processing procedures, or secret or confidential information, including but not limited to credit card numbers, bank account numbers or any similar information.

  e. **"Theft"** means the unlawful taking of **Money**, **Securities** or **Other Property** to the deprivation of an **Insured**.

25. The purpose of the Crime Coverage Part was to protect Blue Compass from losses due to crimes and fraudulent activity against it. According to The Hartford, Twin City's parent company, a "commercial crime insurance policy helps cover a wide range of losses caused by dishonest acts, such as thefts and embezzlements," and employee theft coverage "is the foundation of commercial crime insurance."[2] The Hartford also provides, as an example of an employee theft claim, a scenario where the insured "discovered a scheme in which its purchasing manager created a fraudulent vendor for which the insured was the only customer. The vendor purchased supplies and services from the insured's former suppliers and resold these to the insured at inflated prices. In addition, many of the items ordered were never delivered. The purchasing manager was able to perpetrate the fraud with the assistance of other employees."[3] The Hartford describes this as a "real-life example of employee theft" and an "actual claim scenario."[4]

---

[2] https://assets.thehartford.com/image/upload/commercial_crime_insurance_overview.pdf.

[3] https://assets.thehartford.com/image/upload/commercial_crime_claims.pdf.

[4] *Id*.

## IV.   Blue Compass's Claim

26.   On May 22, 2023, Blue Compass submitted its claim to Twin City. Twin City acknowledged the claim on May 16, 2023 and assigned Claim Number 23440134 to Blue Compass's claim.

27.   Blue Compass submitted its claim seeking coverage under the Policy's Employee Theft provision which says: "The Insurer will pay for the loss of or damage to Money, Securities, and Other Property that results directly from Theft by an Employee, whether or not identifiable, while acting alone or in collusion with other persons."

28.   Theft is defined as "the unlawful taking of Money, Securities or Other Property to the deprivation of the insured." The terms "unlawful" and "taking" are not defined in the Policy.

29.   Merriam-Webster defines "unlawful" as "not lawful: Illegal" and "not morally right or conventional." *Unlawful*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003). Black's Law Dictionary defines "unlawful" as "not authorized by law; illegal," and "involving moral turpitude." *Unlawful*, Black's Law Dictionary (10th ed. 2014).

30.   Merriam-Webster defines "illegal" as "not according to or authorized by law." *Illegal*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003). Black's Law Dictionary defines "illegal" as "an act that is forbidden by law" and "the state of not being legally authorized." *Illegality*, Black's Law Dictionary (10th ed. 2014).

31.   Merriam-Webster defines "taking" as "to get into one's hands or into one's possession, power, or control," "to transfer into one's own keeping," "to obtain or secure for use," and "to obtain money from, esp. fraudulently." *Take*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003). Black's Law Dictionary defines "taking" as the "act of seizing an article ... with an implicit transfer of possession or control." *Taking*, Black's Law Dictionary (10th ed. 2014).

32. Section 31.03(a) of the Texas Penal Code says a person commits a theft if he "unlawfully appropriates property with intent to deprive the owner of property."

33. In other words, the plain meaning of "unlawful taking" is "the act of seizing or otherwise exercising control over an article such that possession or control of the article is transferred without the owner's authorization or consent." *Ryan, LLC v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, No. 05-22-00286-CV, 2023 WL 2472889, at *4 (Tex. App.—Dallas Mar. 13, 2023, no pet.) (quoting *Tesoro Refinancing & Marketing Co. LLC v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 96 F. Supp. 3d 638 (W.D. Tex. 2015)).

34. A taking is unlawful even if the employer consents to the payment if that consent is ineffective due to the employee's fraudulent actions. *Ryan, LLC*, 2023 WL 2472889, at * 5.

35. Blue Compass authorized payments intended only for NSD and AGWS, respectively. It did not authorize Rogers to inflate the amount of payments to NSD and AGWS in order to funnel Blue Compass's money back to herself.

36. Because Rogers unlawfully took the amount of her kickbacks from Blue Compass, Blue Compass's claim was covered under the terms of the Policy. *See Frazier Indus. Co. v. Navigators Ins. Co.*, 149 F. Supp. 3d 512, 518-19 (D.N.J. 2015) (concluding that a similar scheme was a covered loss under crime policy with nearly identical definition of "employee theft"); *Sherwin-Williams Co. v. Beazley Ins. Co., Inc.*, No. 18-02964, 2020 WL 4226866, at *4 (D. Minn. July 23, 2020) (reaching the same result under crime policy with exactly identical definition of "employee theft").

37. In essence, Rogers's scheme was no different than if she had inflated the bids herself and skimmed a portion off the top before forwarding the payments to NSD and AGWS. *Frazier*, 149 F. Supp. 3d at 518 ("Put another way, the payment to CTC was merely a pre-text for

JMG to receive his share. Consequently, the fact that JMG had the money pass through an intermediary prior to reaching his pocket does not change the fundamental nature of the employee's actions—an 'unlawful taking'—nor its effect—to the 'deprivation of the insured.'").

38. In addition to the amount of her kickbacks, Rogers also stole from Blue Compass in the form of her salary. *Cf.* 18 U.S.C. § 1346 (fraud includes "a scheme or artifice to deprive another of the intangible right of honest services"); *United States v. Clark*, No. 24-20271, 2025 WL 801358, at *1 (5th Cir. Mar. 13, 2025) (affirming conviction for honest services fraud where employee was tasked with finding best deal for his employer but instead engaged in scheme to steer business to one broker in exchange for kickbacks). Had Blue Compass known of her scheme, it would not have consented to continue paying her salary as evidenced by the fact that it fired her shortly after discovering the scheme.

39. On October 31, 2023, Blue Compass filed a proof of loss with Twin City, seeking coverage for theft under the Policy. The proof of loss contained a detailed outline of Rogers's crimes and Blue Compass's investigation.

40. On February 16, 2024, Twin City sent a request for information. On July 20, 2024, Blue Compass responded to Twin City's request for information by providing all information reasonably requested.

41. Twin City did not request any additional information until November 15, 2024. On February 3, 2025, Blue Compass responded to this second request and again provided all information reasonably requested.

42. On April 9, 2025, Twin City denied the claim in its entirety.

## CAUSES OF ACTION

### I. Breach of Contract

43. As detailed above, the parties entered into a valid contract in which Blue Compass agreed to pay premiums to Twin City and Twin City agreed to pay Blue Compass in the event Blue Compass suffered a covered loss. Under the terms of the Policy, a covered loss included the unlawful taking of money to the deprivation of the insured.

44. Blue Compass was deprived of money due to Rogers's unlawful taking. *See Frazier*, 149 F. Supp. 3d at 518 (holding that the portion of inflated contracts that was paid to an employee as kickbacks are an "unlawful taking" under nearly-identical policy language). As a result, Blue Compass sustained a covered loss as a direct result of Rogers's unlawful taking.

45. Twin City did not have a valid basis for denying Blue Compass's claim. By refusing to pay Blue Compass's covered loss, Twin City breached the terms of the Policy, and Blue Compass suffered actual damages in the amount of covered damages that Twin City should have paid.

### II. Violation of the Prompt Payment of Claims Act

46. The Prompt Payment of Claims Act, Section 542.051 *et seq*. of the Texas Insurance Code imposes certain deadlines on insurers.

47. Section 542.055 requires that, within 15 days of receipt of a claim, an insurer must acknowledge receipt of the claim, commence any investigation of the claim, and request from the claimant all items, statements, and forms that the insurer reasonably believes, at that time, will be required from the claimant.

48. Section 542.056 requires that, within 15 business days after receiving all items, statements, and forms reasonably requested, the insurer must notify the claimant of the acceptance or rejection of the claim. If the insurer is unable to accept or reject the claim within that time

period, it must notify the claimant of the reasons the insurer needs additional time. The insurer is required to accept or deny the claim within 45 days after the date the insurer notifies the claimant of the need for additional time.

49. Section 542.058 requires that, within 60 days after receipt of all items, statements, and forms reasonably requested, an insurer must pay a covered claim.

50. Section 542.060 provides that, in addition to the amount of the claim, an insurer who violates any deadline in the act is liable for interest on the amount of the claim at the rate of 18% per year as damages, together with reasonable and necessary attorneys' fees and pre-judgment interest on the amount of the claim.

51. Twin City violated each of these deadlines in the Prompt Payment of Claims Act.

### III. Violation of Chapter 541 of the Texas Insurance Code

52. In addition to the deadlines imposed under Chapter 542 of the Texas Insurance Code, Chapter 541 details certain acts that the Legislature has determined are unfair methods of competition and unfair or deceptive acts or practices.

53. Section 541.060(4)(A) provides that it is an unfair method of competition or an unfair or deceptive act or practice in the business of insurance to fail within a reasonable time to affirm or deny coverage of a claim to a policy holder or submit a reservation of rights letter. Here, Twin City did not affirm or deny coverage for two years after Blue Compass submitted its claim.

54. To add insult to injury, when Twin City eventually denied the claim, after purporting to investigate it for nearly two years, Twin City tried to dissuade Blue Compass from filing suit by telling Blue Compass that there is a provision in the Policy that shortens the statute of limitations to two years after the date Blue Compass discovered the loss. But such a provision is not enforceable in Texas. TEX. CIV. PRAC. & REM. CODE § 16.070; *Spicewood Summit Office Condominiums Ass'n, Inc. v. Am. First Lloyd's Ins. Co.*, 287 S.W.3d 461, 466 (Tex. App.—Austin

2009, pet. denied) (holding that an identical limitation provision was void under Texas law); *Barnett v. DynCorp Int'l, L.L.C.*, 831 F.3d 296, 307 n.10 (5th Cir. 2016) (explaining that "*Spicewood* teaches that parties may not avoid section 16.070 through cleverly drafted limitations provisions"). Thus, Twin City violated Section 541.061 of the Texas Insurance Code.

55. In the alternative, even if the Policy's limitations period were not patently unenforceable under Texas law, Twin City's extreme delay in investigating Blue Compass's claim and denying coverage would have caused Blue Compass to lose its contractual right to benefits. Thus, even if Blue Compass's claim were barred by the limitation in the Policy, Blue Compass would be entitled to recover those benefits as actual damages for Twin City's bad faith. *See USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 497 (Tex. 2018) ("A third rule that our precedent recognizes is that an insured can recover benefits as actual damages under the Insurance Code even if the insured has no right to those benefits under the policy, *if the insurer's conduct caused the insured to lose that contractual right*." (emphasis in original)).

56. As a result of its decision to wait until its purported two-year limitation period expired, Twin City failed to affirm or deny coverage within a reasonable time. For the same reasons, Twin City violated Section 541.060(a)(3) by failing to promptly provide Blue Compass a reasonable explanation of the basis in the Policy, in relation to the facts or applicable law, for its denial of a claim.

## ATTORNEYS' FEES

57. As result of Twin City's wrongful denial of its claim and violation of the Prompt Payment of Claims Act, Blue Compass was required to engage the services of the undersigned law firm. Accordingly, Blue Compass is entitled to recover its reasonable and necessary attorneys' fees incurred in vindicating its rights under the Policy. TEX. CIV. PRAC. & REM. CODE § 38.001; TEX. INS. CODE §§ 541.152, 542.060.

## CONDITIONS PRECEDENT

58. All conditions precedent to Blue Compass's right to recovery have been performed or excused.

## JURY DEMAND

59. Blue Compass demands trial by jury for all issues of fact and tenders the appropriate jury fee with this Original Complaint.

## PRAYER

Blue Compass requests the Court enter judgment in its favor on all causes of action and that Blue Compass recover:

   a. Actual damages;

   b. Treble damages under Section 541.152(b) of the Texas Insurance Code;

   c. Statutory interest under Section 542.060 of the Texas Insurance Code;

   d. Pre-judgment and post-judgment interest at the maximum rate allowed by law;

   e. Court costs and attorneys' fees; and

   f. All other relief to which it is justly entitled.

Respectfully submitted,

By: */s/ Travis M. Brown*
Travis M. Brown,
Texas Bar No. 24061890
tbrown@cokinoslaw.com
Timothy P. Delabar
Texas Bar No. 24116273
tdelabar@cokinoslaw.com
COKINOS | YOUNG
One Galleria Tower
13355 Noel Road, Suite 1375
Dallas, Texas 75240
Telephone: (817) 635-3600
Facsimile: (817) 635-3633

**ATTORNEYS FOR PLAINTIFF
BLUE COMPASS HOLDINGS, LLC**